ORDERED.

Dated:  September 17, 2020

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                          Case No. 8:18-bk-05445-MGW
                                                                Chapter 7
Donald W. Cogswell,

    Debtor.
_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### ON SPOT LINK, LLC'S AMENDED MOTION FOR STAY RELIEF

This case tests the limits of the old maxim "possession is nine-tenths of the law." In 2015, the Sarasota County Sheriff's Office seized forty-three items of personal property from the Debtor's home. Included among those items were various pieces of computer equipment: desktop computers, laptop computers, hard drives, monitors, power cords, flash drives, and a floppy disk. Spot Link, LLC, the Debtor's former employer, claims it owns most of the forty-three items (primarily the computers and hard drives) seized from the Debtor's home.

Under Florida law, possession of personal property creates a rebuttable presumption that a person in possession of property owns it. Thus, the burden is on

Spot Link to prove that it owns the property and that the Debtor's possession of the property was not as owner. With one exception, Spot Link failed to overcome the presumption that the Debtor owned the forty-three items of property he possessed.

## I.    FINDINGS OF FACT

In early 2010, the Debtor began working for Spot Link. Founded by Phil and Marte Grande, Spot Link produced a radio show known as Phil's Gang.[1] The radio show was designed to drive users to Spot Link's website, where listeners had an opportunity to buy a monthly membership subscription that gave subscribers access to daily classes on using stock charts for investing or to buy software products that supposedly helped listeners decide when to buy or sell particular stocks.[2]

The company operated out of an office in Sarasota.[3] The office included a production area (or a studio) where Phil's Gang was produced.[4] Because it produced a radio show, Spot Link owned a variety of sound studio equipment, including microphones and a mixing board.[5] Spot Link also owned a dozen or so computers, which were located at its office in Sarasota.[6]

---

[1] 10/10/19 Trial Tr., Doc. No. 93, p. 85, ll. 10 – 25.

[2] *Id.* at p. 85, l. 10 – p. 88, l. 12.

[3] It appears the office was originally located in Venice, Florida. *Id.* at p. 14, l. 20 – p. 16, l. 23. But in 2015, the office was moved to Sarasota. *Id.* Whether the office was in Venice or Sarasota is not particularly relevant to the issues before the Court.

[4] *Id.* at p. 94, ll. 2 – 9.

[5] *Id.* at p. 94, ll. 2 – 25.

[6] *Id.* at p. 16, ll. 2 – 12; p. 93, l. 18 – p. 94, l. 1.

Spot Link hired the Debtor, who was living in Las Vegas at the time, to develop web-based software and applications that would enable users to track, monitor, and facilitate securities (and other) trading.[7] Spot Link provided the Debtor with an office at its Sarasota location.

In his office, the Debtor had a computer tower under his desk, a couple monitors on the desk, and a laptop.[8] Spot Link also set up a studio at the Debtor's home so he could do a radio show from home on Saturday mornings rather than have to drive into the office.[9]

For several years, the Grandes and the Debtor appeared to have a productive working relationship. Mr. Grande testified that he trained the Debtor and treated him like a son.[10] And the company, by all accounts, was doing well: by 2013, Spot Link was doing roughly $1.2 million in net sales.[11]

In 2013, the Grandes sold a majority interest in Spot Link to the Debtor and his business partner.[12] After the sale closed, the Debtor became Spot Link's CEO.[13] As part of becoming Spot Link's CEO, the Debtor signed an employment agreement

---

[7] Spot Link Ex. 1, Doc. No. 69-1.

[8] 7/11/19 Trial Tr., Doc. No. 93, p. 161, l. 22 – p. 162, l. 16.

[9] 10/10/19 Trial Tr., Doc. No. 93, p. 108, 17 – p. 109, l. 3.

[10] *Id.* at p. 88, l. 20 – p. 89, l. 3.

[11] *Id.* at p. 86, ll. 6 – 17.

[12] Spot Link Ex. 5, Doc. No. 69-5; 10/10/19 Trial Tr., Doc. No. 93, p. 88, ll. 2 – 19.

[13] Spot Link Ex. 5, Doc. No. 69-5; 10/10/19 Trial Tr., Doc. No. 93, p. 88, l. 16 – p. 89, l. 3.

and non-compete agreement.[14] Under his employment agreement, the Debtor agreed to return all company-owned property to Spot Link in the event Spot Link terminated him.[15]

Between October 2013 and April 2015, when the Debtor was Spot Link's CEO, he charged business expenses to his personal American Express card.[16] To get reimbursed for those expenses, the Debtor would submit his credit card statements to Spot Link's CPA, Lora Burgess of Kerkering, Barberio & Co., and identify for her which charges were for business expenses.[17] Spot Link would then pay American Express directly for any business expenses charged to the Debtor's credit card.[18]

At the end of each month, Kerkering Barberio prepared the company's financials.[19] To do so, Ms. Burgess would reconcile the credit cards and bank accounts.[20] She would also prepare a general ledger of all financial transactions for the month.[21] Any business expenses that the company reimbursed the Debtor for would be included on the reconciliation report and general ledger.

---

[14] Spot Link Ex. 5, Doc. No. 69-5.

[15] *Id.*

[16] 7/11/19 Trial Tr., Doc. No. 92, p. 26, ll. 3 – 24; p. 33, ll. 8 – 21; p. 35, l. 23 – p. 36, l. 16.

[17] *Id.* at p. 26, ll. 3 – 24; p. 35, l. 23 – p. 36, l. 16; p. 38, ll. 10 – 18.

[18] *Id.* at p. 35, l. 23 – p. 36, l. 16.

[19] *Id.* at p. 23, l. 1 – p. 24, l. 25; p. 26, l. 17 – p. 28, l. 8.

[20] *Id.* at p. 26, l. 17 – p. 27, l. 4; p. 39, ll. 5 – p. 41, l. 6.

[21] *Id.* at p. 44, l. 2 – p. 45, l. 8.

During the year and a half that the Debtor was CEO, Spot Link reimbursed the Debtor (by making direct payments to his American Express card) for more than $500,000 in business expenses.[22] Most of those expenses were for charges for radio stations.[23] But the expenses also appeared to include two Western Digital hard drives, which were purchased on October 29, 2014, and a Dell Alienware computer, which was purchased on January 14, 2015.[24] The Western Digital hard drive and Alienware computer purchases were included on the company's reconciliation reports and general ledger.[25]

Sometime in early 2015, it appears the Debtor and the Grandes had a falling out. According to Mr. Grande, the Debtor was destroying the company.[26] Whereas the company had been doing roughly $1.2 million in net sales when the Grandes owned it, Mr. Grande claimed it was losing a million dollars a year under the Debtor's stewardship.[27]

---

[22] *Id.* at p. 56, l. 19 – p. 57, l. 20.

[23] 10/10/19 Trial Tr., Doc. No. 93, p. 174, l. 24 – p. 175, l. 18.

[24] Spot Link Ex. 8; Doc. No. 69-8; Spot Link Ex. 12, Doc. No. 69-12; Spot Link Ex. 13, Doc. No. 69-13; Spot Link Ex. 14, Doc. No. 69-14.

[25] Spot Link Ex. 11; Doc. No. 69-11; Spot Link Ex. 12, Doc. No. 69-12; Spot Link Ex. 13, Doc. No. 69-13; Spot Link Ex. 14, Doc. No. 69-14.

[26] 10/10/19 Trial Tr., Doc. No. 93, p. 88, ll. 2 – 15.

[27] *Id.* at p. 86, l. 6 – p. 88, l. 15.

In February 2015, the Grandes, who by then had regained a majority interest in Spot Link, voted to remove the Debtor as managing member of the company and elected themselves to take his place.[28] Things only got worse after that.

Sometime in late February or early March 2015, the Grandes accused the Debtor of using company money to pay for personal expenses.[29] On March 20, 2015, roughly two months after the Debtor bought the Alienware computer, Spot Link requested that Bank of America reverse more than $60,000 in payments that had been made to the Debtor's American Express card. Bank of America ultimately reversed $64,155.11 in payments.[30]

But it didn't stop at reversing the payments.

Spot Link also sought to press charges against the Debtor. Based on Spot Link's complaint, an arrest warrant was later issued for the Debtor, and he was eventually charged with second and third degree grand theft.[31] While the charges were based primarily on Spot Link's complaint that the Debtor used company money to pay for personal expenses,[32] the grand theft charges were apparently also based, at

---

[28] Spot Link Ex. 5, Doc. No. 69-5.

[29] 7/11/19 Trial Tr., Doc. No. 92, p. 158, l. 1 – p. 159, l. 20.

[30] Spot Link Ex. 5, Doc. No. 69-5.

[31] Spot Link Ex. 3, Doc. No. 69-3.

[32] 7/11/19 Trial Tr., Doc. No. 92, p. 158, l. 1 – p. 160, l. 1.

least in part, on allegations that the Debtor had stolen Spot Link's source code for its web-based software applications.[33]

As a result, the Sarasota County Sheriff's Office went to the Debtor's home twice to execute search warrants.[34] The first time, the Sheriff seized all the computers at the Debtor's house, leaving the Debtor without a computer.[35] So the Debtor borrowed a laptop from a friend, Mary Acosta.[36] Coincidentally, Ms. Acosta happens to be Mrs. Grande's sister. When the Sheriff's deputies came back a second time looking for a Dell XPS computer, which was not at the Debtor's house, they ended up seizing Ms. Acosta's laptop.[37]

In all, the Sheriff seized forty-three items—including desktop and laptop computers; hard drives; computer monitors; iPads; iPhones; flash drives and a floppy disk; sound studio equipment (i.e., a mixing board and microphone); and miscellaneous personal items (i.e., photos, copies of contracts, a check stub, and credit card statements).[38] The Sheriff's Office took pictures of the items that were seized and assigned each item a bar code.[39]

---

[33] 10/10/19 Trial Tr., Doc. No. 93, p. 148, l. 7 – p. 149, l. 8.

[34] *Id.* at p. 130, l. 23 – p. 131, l. 10; p. 147, l. 11 – p. 148, l. 15.

[35] *Id.* at p. 147, l. 11 – p. 148, l. 15.

[36] *Id.*

[37] *Id.*

[38] Spot Link Ex. 2, Doc. No. 69-2.

[39] Spot Link Ex. 2, Doc. No. 69-2; Spot Link Ex. 20, Doc. Nos. 69-20 – 69-23.

Although the Debtor denied the grand theft charges, he ultimately entered into a pre-trial diversion program.[40] Under the terms of the pre-trial diversion program, the charges against the Debtor would be dropped so long as the Debtor complied with various conditions.[41] One of those conditions was that the Debtor had to relinquish his property claim to the Allen & Heath editing/mixing board, microphone #3, and two Acer monitors seized from his home.[42] None of the other forty-three items seized from his home were included as a condition of the pretrial diversion program.[43] On July 22, 2016, the State Attorney dropped the charges against the Debtor because he completed the pre-trial diversion program.[44]

But that didn't end things between the parties. Civil litigation between the parties continued to ensue in state court through at least November 2016, during which the Debtor and the Grandes became embroiled in a discovery dispute.[45] To resolve that dispute, the state court ordered (1) the Sheriff to release the mixing board (Barcode #89031425), microphone (Barcode #89031426), and three Acer monitors (Barcode ## 89031430, 89031432 & 89031448) to Spot Link; and (2) that three of the computers seized by the Sheriff—including the Alienware computer (Barcode

---

[40] 10/10/19 Trial Tr., Doc. No. 93, p. 148, l. 7 – 149, l. 11; Spot Link Ex. 4, Doc. No. 69-4.

[41] Spot Link Ex. 4, Doc. No. 69-4.

[42] *Id.*

[43] Spot Link Ex. 2, Doc. No. 69-2; Spot Link Ex. 4, Doc. No. 69-4.

[44] Spot Link Ex. 3, Doc. No. 69-3.

[45] Debtor's Ex. 17, Doc. No. 73-17; Spot Link Ex. 6, Doc. No. 69-6.

#89031431) and Ms. Acosta's laptop (Barcode #89032374)—be imaged.[46] It is unclear whatever came of the imaging of the computers or that litigation.

All we know is that a year and a half later, the Debtor filed for chapter 7 bankruptcy. On his bankruptcy schedules, the Debtor scheduled five computers: one computer that was at his house and four computers that were still in the Sheriff's possession.[47] The Debtor didn't schedule any of the remaining items in the Sheriff's possession because he says he didn't think they had any material value.[48]

After the Debtor filed for bankruptcy, Spot Link moved for relief from the automatic stay so that it could recover the items seized by the Sheriff.[49] In its stay relief motion, Spot Link alleged that it owned the items seized by the Sheriff even though they were in the Debtor's possession.[50] Whether Spot Link is entitled to stay relief therefore turns on whether it owns the items seized by the Sheriff.

The Court tried the ownership issue over two days. At trial, the parties agreed that seventeen of the forty-three seized items were no longer in dispute,[51] leaving

---

[46] Spot Link Ex. 6, Doc. No. 69-6.

[47] 10/10/19 Trial Tr., Doc. No. 93, p. 151, ll. 3 – 7.

[48] *Id.* at p. 151, l. 21 – p. 152, l. 20.

[49] Doc. No. 35.

[50] *Id.* at ¶¶ 5 & 14.

[51] Six items had previously been returned to the Debtor: three iPads (Barcode ##89031424, 89031429 & 89031433); an iPhone (Barcode #89031436); a Samsung cell phone (Barcode #89031456); and an LG grey tablet (Barcode #89031457). Spot Link conceded another five items belonged to the Debtor: a Corsair pink tower (Barcode #89031449); an Ultra black computer (Barcode #89031450); an iPhone (Barcode #89031454); a broken silver iPod (Barcode #89031455);

9

twenty-six items in dispute.[52] This Court must now determine who owns the

remaining twenty-six items of personal property held by the Sheriff.

## II.    CONCLUSIONS OF LAW

Ordinarily, a party's ownership interest in property is determined by state law:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.[53]

Thus, to determine who owns the remaining twenty-six items held by the Sheriff, the

Court must look to Florida law.

Under Florida law, possession of personal property creates a rebuttable

presumption that a person in possession of property owns the property:

> [P]ossession of personal property raises a presumption of title in and ownership of the property by the possessor. . . .[54]

---

and an iPad (Barcode #89031458). And the Debtor conceded that six items belonged to Spot Link: the mixing board (Barcode #89031425); a microphone (Barcode #89031426); three Acer monitors (Barcode ##89031430, 89031432 & 89031448); and a Samsung SSD840 Pro (Barcode #89031439).

[52] In post-trial briefing, Spot Link repeatedly insists that the Debtor testified he was only claiming ownership of four of the twenty-six items. Doc. No. 98 at 4 – 5; Doc. No. 110 at 2 n.5. In support, Spot Link cites to the Debtor's testimony where the Debtor, in response to questioning by Spot Link's counsel, identified four specific pieces of equipment he claimed an interest in. Doc. No. 98 at 5 (citing 7/11/19 Trial Tr., Doc. No. 92, pp. 122 – 123 & 125 – 127). But Spot Link overlooks the fact that the Debtor later clarified that when he had responded to questioning by Spot Link's counsel, he thought she was asking which items he had receipts or other evidence for. 10/10/19 Trial Tr., Doc. No. 93, p. 146, l. 2 – p. 147, l. 3. The Debtor was unequivocal that he was claiming an ownership interest in more than four items. *Id.*

[53] *Butner v. United States*, 440 U.S. 48, 55 (1979).

[54] *Adams v. Bd. of Trs. of Internal Improvement Fund*, 20 So. 266, 276 (Fla. 1896); *see also Russell v. Stickney*, 56 So. 691, 693 (Fla. 1911) (explaining that "possession of personal property is prima facie evidence of ownership"); *Charles Ringling Co. v. Muirheid*, 133 So. 108, 109 (Fla. 1931) (explaining

That presumption, however, can be overcome.[55]

Indeed, nearly 125 years ago, in *Adams v. Board of Trustees of Internal Improvement Fund*, the Florida Supreme Court explained that the rebuttable presumption created by possession of personal property is the "lowest species of evidence."[56] Because it is the lowest species of evidence, the presumption can be overcome by "any evidence showing the character of possession, and that it is not necessarily as owner."[57]

Thus, Spot Link—not the Debtor—bears the burden of proving the true character of the items that were seized. It is up to Spot Link to prove that the Debtor's possession of the property was not as owner. If Spot Link can show that the Debtor's possession of the remaining twenty-six items was just as consistent with Spot Link's ownership of them as it was with the Debtor's ownership of them, then

---

that "[o]ne who has once been the owner of personal property and has the same in his possession and continues in uninterrupted possession of that property is presumed to be the owner").

[55] *Adams*, 20 So. at 276; *Russell*, 56 So. at 693 (explaining that "possession of personal property is prima facie evidence of ownership; but such presumption is rebuttable, and may be overcome"); *Muirheid*, 133 So. at 109 (explaining that although a person who has been the owner of property and remains in possession of it is presumed to be the owner, that presumption may be "overcome by sufficient evidence to convince the jury that he, the former owner continuing in possession, has not remained the owner of the property").

[56] *Adams*, 20 So. at 276.

[57] *Id.*

the presumption of ownership has been overcome.[58] Although that burden is a fairly

easy one, Spot Link still failed to meet it here.

> ### A.    With the exception of one computer, Spot Link failed to overcome the presumption that the Debtor owned the computer equipment in his possession.

Included among the twenty-six disputed items are a total of fifteen computers

and hard drives:

- a Dell Alienware computer tower (Barcode #89031431);
- a Western Digital Tower hard drive (Barcode #89031447);
- a Toshiba laptop (Barcode #89031427);
- an LG Super Micro computer tower (Barcode #89031451);
- a Dell computer tower (Barcode #89031459);
- a laptop computer (Barcode #89032374);
- five Seagate hard drives (one with a power cord) (Barcode ##89031435, 89031442, 89031443, 89031444 & 89031452);
- two Seagate tower computers with power cords (Barcode ##89031445 & 89031446);
- an external hard drive (Barcode #89032375); and
- a Toshiba hard drive with the names Kelly, Tom, and Mary (Barcode #89031434).

Spot Link claims it owns all fifteen computers and hard drives.

To prove that it owned them, Spot Link put on evidence that it bought a

number of computers over the years for its employees to use.[59] Mr. Grande testified

---

[58] *Id.*

[59] 10/10/19 Trial Tr., Doc. No. 93, p. 89, l. 11 – p. 89, l. 5; p. 93, l. 18 – p. 94, l. 23; p. 115, l. 13 – p. 166, l. 4; Spot Link Ex. 16, Doc. No. 69-16; Spot Link Ex. 17, Doc. No. 69-17.

that in order to protect proprietary information, the company would not allow employees to use personal computers for work.[60] Mrs. Grande also testified that before the Debtor was fired, they had a meeting at the company's offices, and during that meeting, she noticed that all the computer equipment that had been in the Debtor's office was missing.[61]

If Spot Link could show that the computers seized by the Sheriff were the same ones that Mrs. Grande claims were removed from Spot Link's office, then it would have met its burden of showing that the Debtor's possession of the computers and hard drives was consistent with Spot Link's ownership of them. But, with one exception, Spot Link failed to make that showing here.

To be sure, there's no question that Spot Link owned a number of computers. At trial, Spot Link introduced into evidence copies of the depreciation schedule for its 2015 taxes, as well as its tangible property tax return for 2016.[62] Spot Link's 2015 depreciation schedule reflects that the company owned at least twenty-three computers;[63] the 2016 tangible property tax return reflected more than two dozen computers (some of which had been disposed of in 2015).[64]

---

[60] 10/10/19 Trial Tr., Doc. No. 93, p. 115, l. 13 – p. 166, l. 4

[61] 7/11/19 Trial Tr., Doc. No. 92, p. 161, l. 22 – p. 162, l. 22.

[62] Spot Link Ex. 16; Doc. No. 69-16; Spot Link Ex. 17, Doc. No. 69-17.

[63] Spot Link Ex. 16; Doc. No. 69-16.

[64] Spot Link Ex. 17; Doc. No. 69-17.

The problem is that, except for one computer (an Alienware), it is impossible to know whether any one of the computers on the depreciation schedule or tangible property tax return is included among the computers and hard drives seized by the Sheriff. For the most part, the depreciation schedule and tangible property tax return refer generically to "computers."[65] Only in a handful of instances does either the depreciation schedule or the tangible property tax return even indicate brand names, such as Toshiba, Dell, or Apple.[66] Neither the depreciation schedule nor the tangible personal property tax return includes serial numbers or other identifying information for the equipment.[67]

Of course, the fact that Spot Link owned more than two dozen computers and that Mrs. Grande supposedly noticed some of them missing from Spot Link's offices—without more—does not prove that the computers in the Debtor's possession belonged to Spot Link. To prove that, Spot Link needed to come forward with some additional evidence to overcome the rebuttable presumption that the Debtor owned the computers in his possession. With the exception of one hard drive, Spot Link failed to do so.

---

[65] Spot Link Ex. 16; Doc. No. 69-16; Spot Link Ex. 17, Doc. No. 69-17.

[66] Spot Link Ex. 16; Doc. No. 69-16; Spot Link Ex. 17, Doc. No. 69-17.

[67] Spot Link Ex. 16; Doc. No. 69-16; Spot Link Ex. 17, Doc. No. 69-17.

    **1.**      **Spot Link failed to overcome the rebuttable
presumption that the Debtor owned the Alienware
(Barcode #89031431), Western Digital hard drive
(Barcode #89031447), or the Toshiba laptop
(Barcode #89031427).**

Although the Sheriff seized fifteen computers and hard drives, the dispute in

this case primarily centers around three of them: the Dell Alienware computer

(Barcode #89031431); the Western Digital hard drive (Barcode #89031447); and the

Toshiba laptop (Barcode #89031427). At trial, Spot Link put on documentary

evidence to overcome the rebuttable presumption that it owned the three computers

primarily at issue. But that evidence was not sufficient to overcome the presumption

that the Debtor owned the three computers.

    **a.**      **Spot Link failed to overcome the
presumption that the Debtor owns the
Alienware computer (Barcode #89031431).**

The Alienware computer is, by far, the toughest call in this case. At trial, Spot

Link offered evidence that would, in most cases, be sufficient to overcome the

presumption that the Debtor owned the Alienware.

For starters, Spot Link's CPA, Lora Burgess, testified that between 2013 and

2015, the Debtor charged business expenses to his personal credit card and then

sought reimbursement for those expenses from Spot Link.[68] To seek reimbursement,

the Debtor would submit his American Express credit card statements to Ms. Burgess

---

[68] 7/11/19 Trial Tr., Doc. No. 92, p. 28, l. 16 – p. 30, l. 6; p. 31, l. 11 – p. 33, l. 21; p. 35, l. 23 – p. 36,
l. 16.

and identify for her which charges were for business expenses.[69] Spot Link would then pay American Express directly for any business expenses.[70]

According to an order summary that Spot Link presented at trial, the Debtor bought a Dell Alienware computer on January 14, 2015 for $1,415.98.[71] The order summary shows that the Debtor charged the purchase to his American Express card,[72] which was confirmed by the Debtor's American Express account statement showing a $1,415.98 charge by Dell.[73] Ms. Burgess testified, based on her review of the American Express account statement, that the Debtor submitted the $1,415.98 charge as a business expense.[74] To buttress that testimony, Spot Link introduced other accounting records—a reconciliation report, a report of all transactions by account, a general ledger, etc.—reflecting that the $1,415.98 charge by Dell was treated as a business expense on the company's books and records.[75] And Spot Link's depreciation schedule and tangible property tax return specifically identified a computer purchased for $1,415.98 in 2015.[76]

---

[69] *Id.*

[70] *Id.*

[71] Spot Link Ex. 12, Doc. No. 69-12.

[72] *Id.*

[73] Spot Link Ex. 13, Doc. No. 69-13.

[74] 7/11/19 Trial Tr., Doc. No. 92, p. 51, ll. 5 – 20; p. 74, ll. 13 – 19.

[75] Spot Link Ex. 13, Doc. No. 69-13; Spot Link Ex. 14, Doc. No. 69-14; Spot Link Ex. 15, Doc. No. 69-15.

[76] Spot Link Ex. 16, Doc. No. 69-16; Spot Link Ex. 17, Doc. No. 69-17.

While the financial records showing that Spot Link treated the Alienware as a business expense were fairly comprehensive, one financial record was notably missing: a copy of the payment that Spot Link sent to American Express for the Alienware computer. Given all the other evidence—Ms. Burgess' testimony, the American Express account statements, the reconciliation, and the general ledger—the fact that Spot Link failed to offer direct evidence of the actual payment for the Alienware ordinarily would not be a problem. After all, based on the other evidence presented at trial, the Court could infer that Spot Link paid American Express for the Alienware.

But here's why the proof of payment matters in this case: recall that on March 18, 2015, Spot Link had Bank of America reverse more than $60,000 in payments the company (at the Debtor's direction) made toward the Debtor's American Express card because, according to Spot Link, those payments were for *personal* expenses.[77] The Debtor contends that to the extent Spot Link paid American Express for the Alienware, that payment was part of the payments that were reversed on March 18, 2015.[78]

Spot Link asks the Court to reject that argument because "Cogswell's attempt to convert Spot Link funds for payment of his personal credit cards occurred months

---

[77] Spot Link Ex. 5, Doc. No. 69-5.

[78] Debtor's Closing Argument, Doc. No. 99 at 9 – 10.

17

*after* the purchase of the Alienware computer and payment by Spot Link for same."[79] Perhaps, but that's not clear from the evidence at trial.

Here's what we do know for sure: the Debtor purchased the Alienware on January 14, 2015 using his American Express card.[80] Ms. Burgess says the Debtor would have submitted his American Express statement showing the charge for the computer to Spot Link.[81] It appears, from the American Express statement at issue, that the Debtor's account period for the period when the Alienware computer was purchased ran from December 27, 2014 to January 27, 2015.[82] So the Debtor could not have submitted the charge for reimbursement until January 28, 2015 at the earliest.

Looking at the accounting records that Spot Link provided at trial, it appears that the first payment Spot Link made to American Express after the Debtor would have received his January 2015 account statement was made on February 13, 2015, when Spot Link made an $18,000 "bulk payment" to the Debtor's American Express card.[83] Over the next week, Spot Link made three more "bulk payments" totaling more than $26,500.[84]

---

[79] Spot Link's Reply, Doc. No. 100 at 4.

[80] Spot Link Ex. 12, Doc. No. 69-12.

[81] 7/11/19 Trial Tr., Doc. No. 92, p. 26, l. 10 – p. 27, l. 4; p. 30, ll. 2 – 6; p. 31, ll. 11 – 23.

[82] Spot Link Ex. 13, Doc. No. 69-13.

[83] Spot Link Ex. 14, Doc. No. 69-14.

[84] *Id.*

But from the exhibits that Spot Link introduced at trial, it is impossible to know whether the nearly $45,000 in "bulk" payments that Spot Link made to American Express between February 13 and February 20 included payment for the Alienware computer. Ms. Burgess never testified when Spot Link paid American Express for the computer. Nor did Ms. Burgess testify how long it normally took for Spot Link to reimburse the Debtor (by making payment to American Express) for business expenses.

It is likewise impossible for the Court to know whether the $60,000 in payments that Spot Link had reversed included the payment Spot Link made to American Express for the Alienware computer. Contrary to Spot Link's claim, the reversal of payments did not occur until months (plural) after Spot Link paid American Express. Assuming Spot Link did pay American Express, reversal of the $60,000 in payments occurred no more than thirty-three days after the *earliest* Spot Link *could have* paid American Express.

In the end, who owns the Alienware comes down to the burden of proof. The Debtor is presumed to own the computer because it is in his possession. And it is Spot Link's duty to overcome that presumption. Spot Link could have easily done so by providing evidence of when it paid American Express for the Alienware, as well as evidence that the payment was not included among the payments that were reversed. But, despite having its CPA testify and introducing a wide variety of financial records, Spot Link failed to present the financial records it needed to overcome the Debtor's presumption of ownership.

19

**b.    Spot Link failed to overcome the presumption that the Debtor owns the Western Digital hard drive (Barcode #89031447).**

As it did with the Alienware computer, Spot Link introduced evidence that it owned a Western Digital hard drive. In particular, Spot Link offered an order summary showing that the Debtor ordered two Western Digital two terabyte hard drives from New Egg for $199.98 in October 2014;[85] the Debtor's American Express statement showing that he charged the Western Digital hard drives to his personal credit cards;[86] and Spot Link's reconciliation and general ledger showing that Spot Link treated payment for the two Western Digital hard drives as a business expense.[87] So why is that not enough to overcome the presumption that the Debtor's owns the Western Digital hard drive seized by the Sheriff?

It is because neither of the Western Digital hard drives that Spot Link apparently reimbursed the Debtor for were seized by the Sheriff. At trial, Spot Link offered into evidence pictures of the items (including the Western Digital hard drive) seized by the Sheriff.[88] After reviewing the picture of the Western Digital hard drive seized by the Sheriff, the Debtor testified it was not one of the ones he bought in

---

[85] Spot Link Ex. 8, Doc. No. 69-8.

[86] Spot Link Ex. 9, Doc. No. 69-9.

[87] Spot Link Ex. 10, Doc. No. 69-10; Spot Link Ex. 11, Doc. No. 69-11.

[88] Spot Link Ex. 20, Doc. Nos. 69-20 – 69-23.

October 2014.[89] Instead, the Western Digital hard drive shown in the picture was one that he bought in 2006—years before he even began working for Spot Link.[90] To bolster his testimony, the Debtor introduced into evidence a receipt for the Western Digital hard drive that he bought in 2006.[91]

The Court found the Debtor's testimony—bolstered by the receipt for the Western Digital hard drive—credible. In fact, Spot Link was unable to impeach the Debtor's testimony that the Western Digital hard drive seized by the Sheriff was not one of the two he was reimbursed for. For instance, neither Mr. Grande nor Mrs. Grande testified that they recognized the Western Digital hard drive as the one the company reimbursed the Debtor for. Nor was Spot Link able to identify the Western Digital hard drive by some other identifying information, such as a serial number. Based on the evidence presented at trial, the Court concludes that the Western Digital hard drive seized by the Sheriff is the one that the Debtor purchased in 2006—not one of the two that Spot Link reimbursed the Debtor for. Spot Link therefore is not entitled to the Western Digital hard drive.

---

[89] 10/10/19 Trial Tr., Doc. No. 93, p. 158, l. 16 – p. 162, l. 7; Spot Link Ex. 20, Doc. No. 69-21.

[90] 10/10/19 Trial Tr., Doc. No. 93, p. 158, l. 16 – p. 162, l. 7; Spot Link Ex. 20, Doc. No. 69-21.

[91] Debtor's Ex. 5, Doc. No. 73-5.

    **c.**    **Spot Link failed to overcome the**
            **presumption that the Debtor owns the**
            **Toshiba notebook (Barcode #89031427).**

Spot Link's evidence that it owns the Toshiba notebook was far less compelling than was its evidence that it owned the Alienware computer or Western Digital hard drive. Spot Link's evidence primarily consisted of Mrs. Grande's testimony that she had seen Toshiba computers around the office,[92] as well as Spot Link's 2015 depreciation schedule and 2016 tangible property tax return, both of which reflected that Spot Link owned a Toshiba notebook that had been purchased in 2007.[93]

Spot Link, however, failed to prove that any of the Toshiba computers that Ms. Grande may have seen around the office—or the Toshiba laptop on the company's depreciation schedule—was the same one seized by the Sheriff. That alone is enough to doom Spot Link's claim to the Toshiba notebook computer. But Spot Link's fails to overcome the presumption that the Debtor owns the computer for a more fundamental reason: the Debtor provided actual proof of ownership.

For starters, the Debtor's wife credibly testified that she bought the Toshiba notebook seized from her home to use for school while the couple lived in Nevada.[94] What's more, the Debtor introduced a receipt for a Toshiba notebook computer he

---

[92] 10/10/19 Trial Tr., Doc. No. 93, at p. 21, ll. 3 – 23.

[93] Spot Link Ex. 16, Doc. No. 69-16; Spot Link Ex. 17, Doc. No. 69-17.

[94] 10/10/19 Trial Tr., Doc. No. 93, p. 133, l. 16 – p. 136, l. 2.

bought in 2012.[95] The receipt identifies the computer by model number: Z835-P330.[96] The Z835-P330 model number matches the model number from the picture of the Toshiba notebook that was seized by the Sheriff.[97] Thus, the Debtor need not rely on the presumption created by possession of the computer: the Debtor affirmatively proved he owns the Toshiba notebook.

### 2.    Spot Link failed to overcome the presumption that the Debtor owns the LG Super Micro computer tower (Barcode #89031451).

Spot Link failed to introduce any evidence that it owned the LG Super Micro computer, other than Mrs. Grande's testimony that she believed it was Spot Link's computer.[98] But that testimony was rebutted by the Debtor's testimony that he believed he had bought the parts for the computer and built it, which the Court found credible.[99] And on cross-examination, Ms. Grande was forced to concede the company had no documents to prove Spot Link owned the LG Super Micro computer.[100] Spot Link therefore failed to rebut the presumption that the Debtor owned the LG Super Micro computer.

---

[95] Debtor's Ex. 2, Doc. No. 73-2.

[96] *Id.*

[97] Debtor's Ex. 2, Doc. No. 73-2; Spot Link's Ex. 20, Doc. No. 69-20.

[98] 10/10/19 Trial Tr., Doc. No. 93, p. 30, ll. 3 – 8.

[99] *Id.* at p. 155, l. 2 – p. 157, l. 2.

[100] *Id.* at p. 30, ll. 3 – 8.

### 3.   Spot Link failed to overcome the presumption that the Debtor owns the Dell computer tower (Barcode #89031459).

Spot Link offered scant evidence that it owns the Dell computer tower. In particular, Mrs. Grande testified that she recalled buying a Dell computer sometime in 2012 or 2013.[101] And Spot Link's depreciation schedule reflected a Dell desktop computer, though one purchased in 2007—not 2012 or 2013.[102]

Again, Spot Link, which didn't have any documents showing that it owned the Dell computer,[103] failed to prove that the Dell computer Mrs. Grande recalls buying (or the one listed on the company's depreciation schedule) was the one seized by the Sheriff. In fact, Mrs. Grande conceded that the company had more than one Dell computer and that she could have been thinking about one of those computers rather than the one taken from the Debtor's house.[104]

To counter that evidence, the Debtor testified that he helped someone fix the Dell computer and then later helped the person get a new one, and in return, the person gave him the Dell.[105] He says he listed the Dell computer on his schedules and bought it back from the Trustee.[106] In fact, the Debtor did buy back a Dell computer

---

[101] *Id.* at p. 31, ll. 3 – 19.

[102] Spot Link Ex. 16, Doc. No. 69-16.

[103] 10/10/19 Trial Tr., Doc. No. 93, p. 31, ll. 6 – 10.

[104] *Id.* at p. 31, l. 20 – p. 32, l. 3.

[105] *Id.* at p. 155, ll. 2 – 21; p. 156, l. 18 – p. 157, l. 2.

[106] 7/11/19 Trial Tr., Doc. No. 92, at p. 106, l. 13 – p. 116, l. 11.

from the Trustee.[107] Even if that were not the Dell computer seized by the Sheriff,
Spot Link failed to put on sufficient evidence to overcome the presumption that the
Debtor owned the computer.

> ### 4.   Spot Link failed to overcome the presumption that the Debtor owns the "laptop computer" (Barcode #89032374).

The item designated as a "laptop computer" on the list of items seized by the
Sheriff is an easy call. The Debtor says it belongs to Mary Acosta. According to the
Debtor, Acosta loaned him the computer after the Sheriff initially seized all his
computers, leaving him without a computer.[108] The Sheriff apparently came back a
second time looking for a particular computer and ended up seizing Mrs. Acosta's
computer in the process.[109] Spot Link failed to offer any evidence to rebut the
Debtor's version of events—much less to prove it owned the laptop. Spot Link
therefore is not entitled to recover the "laptop computer."

> ### 5.   Spot Link failed to overcome the presumption that the Debtor owned the two Seagate computer towers (Barcode ##89031445 & 89031446) or five Seagate hard drives (Barcode ## 89031435, 89031442, 89031443, 89031444 & 89031452).

In all, the Sheriff seized seven Seagate computers: two Seagate computer
towers and five Seagate hard drives. Mrs. Grande conceded that she was not familiar

---

[107] Spot Link Ex. 18, Doc. No. 69-18.

[108] 10/10/19 Trial Tr., Doc. No. 93, p. 147, l. 6 – p. 148, l. 6.

[109] *Id.*

with the Seagate hard drives and didn't know who owned the Seagate computer

towers.[110] The only evidence that Spot Link put on to prove that it owned the Seagate

computers and hard drives was testimony by Mr. Grande, who looked at a picture of

one of the five Seagate hard drives and testified that he "believed" it was Spot Link's

equipment.[111] Suffice it to say that testimony is not enough to rebut the presumption

that the Debtor owned the Seagate computer towers and hard drives. Spot Link

therefore is not entitled to recover them.

> **6.    Spot Link failed to overcome the presumption that
> the Debtor owned the external hard drive
> (Barcode #89032375).**

In addition to the Seagate external hard drives, the Sheriff also seized another

external hard drive. That hard drive is identified on the list of property only as an

"external hard drive,"[112] with no indication of who manufactured it.[113] At trial, Mrs.

Grande conceded that she doesn't have any evidence showing that Spot Link owned

the hard drive.[114] Neither Mr. Grande nor Mrs. Grande testified that Spot Link

owned it. Absent any evidence to rebut the presumption that the Debtor owned it,

Spot Link is not entitled to recover the hard drive.

---

[110] *Id.* at p. 27, l. 12 – p. 28, l. 4; p. 30, ll. 9 – 14.

[111] *Id.* at p. 114, ll. 12 – 16.

[112] Spot Link Ex. 2, Doc. No. 69-2.

[113] *Id.*

[114] 10/10/19 Trial Tr., Doc. No. 93, p. 35, ll. 13 – 18.

**7.**    **Spot Link barely overcame the presumption that the Debtor owned the Toshiba hard drive with the names Kelly, Tom, and Mary (Barcode #89031434).**

As far as computers go, that leaves us with a Toshiba hard drive with the names Kelly, Tom, and Mary. This is the only computer that Spot Link was able to overcome the presumption that the Debtor owned it.

It was undisputed at trial that Spot Link had employees named Kelly, Tom, and Mary. It was also undisputed that the company would back up its proprietary information to hard drives. The Debtor offered no explanation why the names of Spot Link employees would be on the hard drive if it belonged to him. The obvious inference is that the hard drive with the names Kelly, Tom, and Mary was used to back up information from Kelly's, Tom's, and Mary's computers. Spot Link has therefore overcome the presumption that the Debtor owned the Toshiba hard drive with the names Kelly, Tom, and Mary on it and is entitled to its return.

**B.**    **Spot Link failed to overcome the presumption that the Debtor owns the miscellaneous other items.**

The eleven remaining items in dispute consist of some computer equipment (i.e., a Dell AC/DC power adapter and a Dell monitor with power cord);[115] some

---

[115] The Dell AC/DC adapter was assigned Barcode #89031428; the Dell monitor with power cord was assigned Barcode #89031453. Spot Link Ex. 2, Doc. No. 69-2.

flash drives and a floppy disk;[116] a "Pandigital";[117] and miscellaneous other items (a CD of photos of items seized from the Debtor's home; the Debtor's employment and software development agreements; records subpoenaed from Bank of America regarding American Express transactions; a copy of a check stub for check number 9786; and records subpoenaed from American Express).[118] It's hard to believe Spot Link is fighting over these eleven items.

In any event, Mrs. Grande conceded that four of the items—a computer disk (Barcode #89031438), the CD of photos of items seized from the Debtor's home (Barcode #89301504), copies of the Debtor's employment and software development agreements (Barcode #89032229), and the American Express records (Barcode #89046434)—are the Debtor's.[119] Another two items—an assortment of flash drives (Barcode #89031437) and an orange floppy disk (Barcode #89031440)—Mrs. Grande testified she had no idea who owned.[120]

---

[116] An assortment of flash drives was assigned Barcode #89031437; a computer disk was assigned Barcode #89031438; and an orange floppy disk was assigned Barcode #89031440. *Id.*

[117] The Pandigital was assigned Barcode #89031441. *Id.*

[118] The CD of photos was assigned Barcode #89301504; the Debtor's employment and software development agreements were assigned Barcode #89032229; the Bank of America records were assigned Barcode #89032230; the check stub was assigned Barcode #89032231; and the American Express records were assigned Barcode #89046434. *Id.*

[119] 10/10/19 Trial Tr., Doc. No. 93, p. 25, ll. 22 – 25; p. 32, l. 9 – p. 33, l. 14; p. 36, ll. 8 – 10.

[120] Mr. Grande did testify that he believed the flash drives belonged to Spot Link. 10/10/19 Trial Tr., Doc. No. 93, p. 111, ll. 8 – 14. But given how ubiquitous flash drives are, that testimony—by itself—is not enough to overcome the presumption that the Debtor owns them.

For three more—the Pandigital (Barcode #89031441), the Bank of America records (Barcode #89032230), and the check stub (Barcode #89032231)—Mrs. Grande testified they belonged to Spot Link only if certain things were true: the Pandigital, she says, was Spot Link's if it was radio equipment;[121] the bank records were the company's if it had the company's name on it;[122] and the check stub was the company's if the check was drawn on the company's account.[123] Yet, Spot Link failed to offer any evidence that the Pandigital is radio equipment, that the bank records had the company's name on them, or that check number 9786 was drawn on the company's account.

That leaves two miscellaneous items remaining: the Dell AC/DC adapter (Barcode #89031428) and the Dell monitor with power cord (Barcode #89031453). The only evidence Spot Link offered to overcome the presumption that the Debtor owns those items was Mr. Grande's testimony that the Dell AC/DC adapter was the company's and Mrs. Grande testimony that the company had Dell monitors before and doesn't have them now.[124] That testimony—without more—is not enough to overcome the presumption that the Debtor owns those items.

---

[121] 10/10/19 Trial Tr., Doc. No. 92, p. 26, l. 15 – p. 27, l. 11.

[122] *Id.* at p. 33, ll. 18 – p. 34, l. 3.

[123] *Id.* at p. 35, ll. 1 – 12.

[124] *Id.* at p. 23, ll. 5 – 23; p. 30, ll. 15 – 18.

**C.    The fact that the Debtor did not list all twenty-six items on his bankruptcy schedules does not bar him from claiming he owns them.**

Even though it was unable to muster enough evidence to overcome the presumption that the Debtor owns all but one of the twenty-six items in the Sheriff's possession, Spot Link nonetheless contends that the Debtor cannot claim he owns the disputed items because he failed to disclose the majority of them on his schedules. Though Spot Link never quite uses the words "judicial estoppel," in essence that's its argument: the Debtor should be judicially estopped from claiming he owns the twenty-six items by virtue of his failure to disclose them.

Judicial estoppel is an equitable doctrine intended to protect the integrity— and prevent the perversion—of the judicial process by "prohibiting parties from deliberately changing positions according to the exigencies of the moment."[125] Courts in the Eleventh Circuit follow a two-part test to determine whether judicial estoppel applies: first, the court must determine whether the party took an inconsistent position under oath; second, if the party did take inconsistent positions, the court must determine whether the inconsistent positions were "calculated to make a mockery of the judicial system."[126]

---

[125] *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180 (11th Cir. 2017) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).

[126] *Id.* at 1181 (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)).

At first glance, it appears the Debtor has taken inconsistent positions. In his schedules, which were signed under oath, the Debtor only disclosed five computers (a laptop computer and four desktops) and no hard drives. Of the five computers, one was located at the Debtor's home; the other four were in the Sheriff's possession. At trial, though, the Debtor took the position that he is entitled to the return of seven computers and eight hard drives remaining in the Sheriff's possession.

For the most part, the Debtor has accounted for this apparent discrepancy. For instance, the Debtor points out that two of the computers that are in dispute (the Toshiba notebook and the laptop computer) belong either to his wife (the Toshiba notebook) or Ms. Acosta (the laptop).[127] As for other items—hard drives, flash drives, a floppy disk, copies of contracts, pictures, a check stub, etc.—the Debtor testified his understanding was that he didn't have to schedule any items of immaterial value.[128]

Overall, the Court finds the Debtor's explanation credible. The Court agrees that the Debtor was not required to schedule flash drives, floppy disks, copies of contracts, pictures, check stubs, and the like. Those obviously have no material value. What about the hard drives? Even if that's a closer call, the Court accepts the Debtor's explanation that he didn't schedule them because he didn't believe they had any material value.

---

[127] 10/10/19 Trial Tr., Doc. No. 93, p. 152, l. 17 – p. 153, l. 21.

[128] *Id.* at p. 151, l. 21 – p. 152, l. 16.

31

The only real concern the Court has—if you can call it that—is that the Court can't quite reconcile which computers were scheduled and which weren't. In all, there are seven computers that are in dispute. As explained above, two of those are owned by third parties (the Debtor's wife and Ms. Acosta). Presumably, those are not included among the four listed on his bankruptcy schedules (though he still seeks their return). That leaves five computers owned by the Debtor that are in the Sheriff's possession—one more than he scheduled.

Worst case, then, the Debtor failed to schedule one computer. Technically, that makes his bankruptcy schedules inconsistent with the position he took at trial. Even so, given the evidence at trial, the Court is not convinced that the Debtor changed his position based on the exigencies of the moment or that the inconsistency was intended to make a mockery of the system. Thus, the Debtor's failure to schedule any of the twenty-six items remaining in the Sheriff's possession doesn't bar him from claiming he owns them.

### D.    The Debtor is entitled to the return of twenty-five of the twenty-six disputed items.

Spot Link has one last argument why the Debtor is not entitled to the disputed items in the Sheriff's possession: Spot Link says to the extent the Debtor owned any of them, they are property of the estate.[129]

---

[129] Doc. No. 98 at 15 – 16.

Unquestionably, once the Debtor filed this case, any items he owned (twenty-five of the twenty-six) became property of the bankruptcy estate. Bankruptcy Code § 541 casts a wide net, catching (subject to the exclusions in § 541(b) that do not apply here) all the Debtor's legal and equitable interests in property as of the commencement of the case.[130] But property of the estate can leave the estate in four ways, one of which is abandonment by the Chapter 7 Trustee.[131]

Here, at a preliminary hearing on Spot Link's stay relief motion, the Trustee appeared at the hearing and explained that she was not initially aware that any of the Debtor's property was in the Sheriff's possession. So none of that property was appraised or administered. Even so, at the hearing, which was attended by the Debtor and Spot Link, the Trustee announced her intention to abandon any property in the Sheriff's possession.

After that hearing, but before the trial on Spot Link's stay relief motion, the Trustee filed her Notice of Final Report,[132] which was approved by the Court. In her Final Report, which Spot Link never objected to, the Trustee represented that all the Debtor's scheduled *or known* assets had either been reduced to cash, released to the

---

[130] 11 U.S.C. § 541(a)(1).

[131] The other three ways property leaves the estate is if it is sold under § 363; if stay relief is granted under § 362; or if the property is claimed as exempt under § 522 and the claim of exemption is not objected to.

[132] Doc. Nos. 37 & 38.

Debtor as exempt, or have been or will be abandoned.[133] Thus, the Trustee has confirmed her intent to abandon the property, though the Trustee has not taken the final step of filing a notice of abandonment.

Once the Trustee files her notice of abandonment, the items in the Sheriff's possession (other than the Toshiba hard drive with the names Kelly, Tom, and Mary on it) will revert back to the Debtor. The Court therefore concludes that the Debtor is entitled to all but one of the twenty-six items even though they were property of the estate.

## III.   CONCLUSION

This contested matter came down to who had the burden of proof. Because the Debtor was in possession of the items seized by the Sheriff, there was a rebuttable presumption that he owned the items. It was up to Spot Link to come forward with evidence proving that it owned the items and that the Debtor's possession was not inconsistent with Spot Link's ownership. With one exception, Spot Link failed to do so. Therefore, the Court will enter a separate order granting Spot Link stay relief to recover possession of the Toshiba hard drive with the names Kelly, Tom, and Mary on it (Barcode #89031434) and directing the Sarasota County Sheriff's Office to release the remaining twenty-five items in dispute to the Debtor.

---

[133] Doc. No. 37 at ¶ 3.

Attorney Christopher Smith is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who do not receive service by CM/ECF and to file a proof of service within three days of entry of these Findings of Fact and Conclusions of Law.

**Christopher D. Smith, Esq.**
**Christopher D. Smith, P.A.**
 *Counsel for the Debtor*

**Eric S. Olson, Esq.**
**Kelley Geraghty Price, Esq.**
**Cohen & Grigsby, P.C.**
 *Counsel for Spot Link, LLC*